**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **K.S. and LISA A., Individually and as** | ) | |
| **Parent and Next Friend of K.S.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 16-CV-22-NJR-DGW** |
| | ) | |
| **BOARD OF EDUCATION OF THE** | ) | |
| **VANDALIA COMMUNITY UNIT** | ) | |
| **SCHOOL DISTRICT NO. 203,** | ) | |
| | ) | |
| **Defendant.** | ) | |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

This case is before the Court on cross motions for summary judgment filed by Plaintiffs K.S. and Lisa A., Individually and as Parent and Next Friend of K.S. (collectively "Plaintiffs") and Defendant Board of Education of the Vandalia Community Unit School District No. 203 (the "District") (Docs. 29 and 31). Plaintiffs brought this action pursuant to the Individuals with Disabilities Education Act ("IDEA"), to recover attorney's fees under 20 U.S.C. § 1415(i)(3)(B) they incurred prevailing in a due process hearing against the District. For the reasons set forth below, the Court grants in part and denies in part both motions for summary judgment.

## BACKGROUND

K.S. is a young man with multiple disabilities, including a learning disability, anxiety, and depression, which impact his ability to participate in his community (Doc. 30, p. 2; Doc. 30-2, p. 2). From second grade through senior year of high school, K.S. received

special education and related services from the District under the IDEA (Doc. 1, p. 3, 6). Specifically, he received an Individualized Education Program ("IEP") to address his educational needs (Doc. 32, p. 1). In October 2014, the fall semester of K.S.'s senior year of high school at Vandalia Community High School ("VCHS"), K.S. came to school under the influence of drugs (*Id.*).

The District's IEP team held a Manifestation Determination Review Hearing to determine whether K.S.'s conduct was a manifestation of his disability (Doc. 32-9, p. 1). After determining that coming to school under the influence of drugs was not a manifestation of K.S.'s disability, the School Board of Vandalia CUSD No. 203 voted to expel K.S. from VCHS, but arranged for him to receive services at a private day school, Cornerstone Academy (Doc. 32, p. 2, Doc. 30, p. 2). This emergency placement was intended for 45 school days (Doc. 30, p. 2). Because she disagreed with K.S.'s removal from the District, K.S.'s mother, Lisa A., requested—and the District agreed—to engage in mediation on October 17, 2014 (*Id.*).

After mediation did not resolve the issues, Lisa A. requested a special education due process hearing on January 20, 2015 (Doc. 30, p. 2). Lisa A. raised five issues, alleging that the District denied K.S. a Free Appropriate Public Education ("FAPE") by failing to: (1) reevaluate K.S.; (2) develop an appropriate IEP, including failing to develop measurable annual goals and provide appropriate related services; (3) develop appropriate measurable transition goals and provide transition services; (4) conduct a Functional Behavior Analysis and develop a Behavior Intervention Plan; and (5) conduct an appropriate Manifestation Determination Review on October 10, 2014 (Doc. 30, p. 3).

That hearing was automatically docketed as an expedited hearing because it involved student discipline (Doc. 32, p. 2). On February 3, 2015, however, an order was entered converting the expedited hearing to a standard hearing because the exigent circumstances making an expedited hearing no longer existed, and Lisa A. had not requested an expedited hearing (Doc. 30-1, p. 3).

At that time, Lisa A. also filed an emergency motion challenging K.S.'s "stay put" placement,[1] seeking to place K.S. back in VCHS as his "stay put" placement during the pendency of the due process hearing (Doc. 30, p. 3; Doc. 32, p. 2; Doc. 32-9, p. 1). The issue was complicated because, at the time, K.S.'s 45-day interim placement had expired and there was a question of where K.S. should properly be placed during the ongoing litigation (Doc. 33-8). On February 12, 2015, the IHO ruled in favor of the District, denying the motion to establish the "stay put" placement of K.S. at VCHS (Doc. 32-9). Plaintiffs' attorneys then asked for clarification of the IHO's order on the "stay put" placement decision, and the IHO issued clarification that same day (Doc. 32-10).

The parties met for an IEP meeting for K.S. on February 23, 2015 (Doc. 32, p. 3). Two of Plaintiffs' attorneys traveled from Chicago to Vandalia to attend this IEP meeting (*Id*.). On March 2, 2015, the IHO conducted a prehearing conference via telephone, which was insufficient to cover everything, so another one was held a few days later (*Id*.).

The due process hearing was held on April 27, April 30, and May 1, 2015 (Doc. 30, p. 4; Doc. 32, p. 4). The IHO identified the issues for resolution as follows:

> 1.  Did the School District conduct an appropriate re-evaluation of the student from January 20, 2013, until the present, and, if not, did this result in the denial of FAPE?

---

[1]  Generally, the "stay put" provision of the IDEA acts as an automatic injunction to maintain a student in his then current placement during a due process hearing. 34 CFR 300.518(a); *see Casey K. ex rel. Norman v. St. Anne Cmty. High Sch. Dist. No. 302*, 400 F.3d 508, 511 (7th Cir. 2005).

2. Did the Student's IEPs from January 20, 2013, until the present offer FAPE to the Student by appropriately addressing all of his educational and related services needs that result from his disabilities?

3. Did the Student's IEPs from January 20, 2013, meet the requirements of IDEA with respect to the statements of the Student's present levels of performance and measurable annual goals and, if not, did this result in the denial of FAPE?

4. Did the School District develop appropriate transition goals and provide appropriate transition services for the Student from January 20, 2013 to the present?

5. Did the School District conduct an appropriate functional behavioral analysis ("FBA") for the Student and/or develop an appropriate behavioral intervention plan ("BIP") for the Student from January 20, 2013, until the present and, if not, did this result in the denial of FAPE?

6. Did the School District conduct an appropriate manifestation determination review ("MDR") for the Student on October 10, 2014?

7. Is the Stay of Expulsion Agreement of October 15, 2014, valid and enforceable?

8. Did the Mother properly request an independent educational evaluation at public expense and/or an evaluation by the School District during the 2014-15 school year and, if so, did the School District meet its responsibilities in accordance with applicable law and regulations?

9. Is the Mother entitled to reimbursement of the cost of an independent psychological evaluation of the Student she obtained at her expense in April, 2015?

10. Would an Order directing the School District to allow the Student to participate in the VCHS commencement ceremony on May 16, 2015 be a proper exercise of the hearing officer's authority if Issue #6 is decided in favor of the Student and Mother?

(Doc. 1-1, p. 3-4).

On May 14, 2015, the IHO issued his Final Decision and Order finding the following:

1. The Student's expulsion of October 15, 2014, is rescinded due to an inappropriate Manifestation Determination Review on October 10, 2014.

2. Within 30 days of the date of this Order the School District shall reimburse the Mother for the cost of the independent psychological evaluation of Dr. Frederic Golden in the amount of $2,100.00.

3. The Student's eligibility under IDEA shall be extended through the 2015-2016 school year, and whether the Student's eligibility should continue beyond the 2015-2016 school year shall be determined by the IEP team at an annual review meeting in 2016.

4. Within 30 days of the date of this Order the School District shall schedule independent assessments of the Student's vocational, independent living and community skills at the School District's expense. The assessments shall determine the Student's present levels of performance in objective and measurable terms, and this baseline information shall be used in addition to other available information to develop measurable transition goals and benchmarks.

5. Within 30 days of the date of this Order the School District's school psychologist or a qualified independent evaluator at the School District's expense shall conduct a comprehensive evaluation of the Student's math and reading comprehension skills. The evaluation shall determine the Student's levels of mastery and achievement in math and reading comprehension for the purpose of determining present levels of performance in order to write measurable goals and benchmarks for the 2015-2016 school year and to recommend appropriate services for the Student in reading and math.

6. Within 30 days of the date of this Order, the School District shall complete a social developmental history of the Student by an individual qualified under 23 Ill. Adm. Code 226.840.

7. In administering the new assessments and evaluations, appropriate and individualized modifications and accommodations shall be made for the Student's attention deficit disorder in consultation with the Student, his Mother, his counselor, Dr. Golden, and teachers and school support personnel from Cornerstone, Mid-State and VCHS.

8. Starting on June 1, 2015 through the end of the 2015-2016 school year, the School District shall pay for two sixty-minute private individual counseling sessions per month for the Student to address his social emotional and adaptive behavior problems. The Mother and the Student shall have the option of continuing to have Mr. Monken

provide these counseling services, or agreeing with the School District on a new behavioral healthcare professional to provide the services. The School District's financial responsibility for the individual counselling sessions shall terminate prior to the end of the 2015-2016 school year if the counselor determines that the Student's counseling objectives have been met and the counselor recommends that counseling is no longer appropriate for the Student, or if the counseling is discontinued by the counselor due to lack of cooperation by the Student.

9. The School District shall allow the Student to enroll in a summer automotive mechanics course, if available, at the School District's expense either at a local community college, the Okaw Vocational Center or another location within a reasonable distance from his home at the School District's expense. The Student's participation in the course is conditioned upon his compliance with applicable rules and policies, including health and safety requirements. The School District's transition coordinator or a transition specialist shall assist the Mother and Student in locating a class upon request.

10. Either a school psychologist, a school social worker, or both, and a transition specialist or transition coordinator shall be part of the Student's IEP team commencing with the date of this Order.

11. Within 10 days after the completion of the vocational and independent living skills assessments and the math and reading evaluations, the School District shall convene a meeting of the IEP team, which for this meeting shall include the individuals conducting the new assessments and evaluations, to develop a transition IEP for the Student for 2015-2016. The transition IEP shall contain individualized and measurable goals and benchmarks that logically flow from the present levels of performance derived from the recommendations of the new assessments and evaluations, information from Cornerstone staff, input of the Mother, Student and counselor, and other relevant information available for the Student. The transition IEP shall include individualized modifications and accommodations to address the Student's attention deficits consistently across all settings in which the Student will be placed or engaged in activities during the 2015-2016 school year. If the IEP team determines that a behavior intervention plan (BIP) is appropriate for the Student in one or more settings, the BIP shall be based on a functional behavioral analysis (FBA) conducted by an individual who is trained and experienced in behavioral analysis and interventions such as a school social worker or school psychologist.

(Doc. 1-1, p. 19). Both the District and Plaintiffs subsequently requested a clarification of the IHO's Final Decision and Order (Doc. 30, p. 4-5; Doc. 32, p. 4). The IHO then issued a Clarification of the Final Decision and Order on May 26, 2015 (Doc. 30, p. 5; Doc. 30-11).

Although K.S. remained at Cornerstone for the remainder of the 2014-2015 school year, K.S. received a diploma from VCHS on May 16, 2015 (Doc. 32, p. 2-3; Doc. 32-2, p. 4). K.S. and his family attended the graduation ceremony, despite the fact that K.S. was not allowed to participate in the ceremony (Doc. 32-2, p. 4).

On September 22, 2015, the District filed an appeal of the IHO decision pursuant to 20 U.S.C. § 1415(i)(2)-(3) (*See* Doc. 1 in Case No. 15-cv-1048-NJR-DGW). The undersigned district judge ultimately dismissed the appeal based on the District's failure to file it within the period required by the statute of limitations (*See* Doc. 25 in Case No. 15-cv-1048-NJR-DGW).

On January 7, 2016, Plaintiffs filed this case, seeking recovery of their attorneys' fees expended for representation in the administrative due process hearing, district court appeal, and this proceeding, plus prejudgment interest (Doc. 1). The case was originally assigned to the Honorable David R. Herndon. On May 4, 2017, Judge Herndon transferred this case to undersigned, on the basis that it was related to the appeal filed in Case No. 15-cv-1048-NJR-DGW.

On May 26, 2017, Plaintiffs filed their motion for summary judgment (Docs. 29, 30), and the District filed a cross motion for summary judgment (Docs. 31, 32). On June 26, 2017, Plaintiffs filed their memorandum in opposition to the District's motion for summary

judgment (Doc. 33). On June 29, 2017[2] the District filed its sealed response[3] to Plaintiffs' motion for summary judgment (Doc. 34). On July 14, 2017, the District filed a reply brief (Doc. 37). On July 20, 2017, Plaintiffs filed a reply brief (Doc. 38).

## LEGAL STANDARD

Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (*quoting* FED. R. CIV. P. 56(a)). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 232-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A "court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence . . . ." *Reid v. Neighborhood Assistance Corp. of America*, 749 F.3d 581, 586 (7th Cir.

---

[2] Due to confusion stemming from the fact that Case Management/Electronic Case Filing ("CM/ECF") system generated a response date of June 29, 2017, after Magistrate Judge Wilkerson had set a response date of June 26, 2017, responses filed by either of those dates are considered timely.

[3] The Court notes that, although this brief is confined within 20 pages, four of those pages consist of argument formatted into single-spaced bullet points. The Court cautions defense counsel to consult Local Rule 7.1(d) prior to filing another brief in this Court.

2014) (*quoting Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005)).

"The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment: we construe all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). Summary judgment may be appropriate in an attorney's fee case brought pursuant to 28 U.S.C. § 1415(i)(3). *See, e.g., J.F. v. Board of Educ. of City of Chicago, Dist. 299*, No. 10 C 00614, 2011 WL 3839660, at *7 (N.D. Ill. Aug. 26, 2011) (district court determined reasonableness of fees on cross motions for summary judgment); *see, e.g., Brianna O. v. Board of Educ. of City of Chicago, Dist. 299*, No. 10 C 2132, 2010 WL 4628749, at *14 (N.D. Ill. Nov. 8, 2010) (district court determined reasonableness of fees on cross motions for summary judgment).

### ANALYSIS

The purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education." 20 U.S.C. § 1400(d)(1)(A). This is often referred to as "FAPE." The details of the child's program are set forth in an IEP, which is formulated by school officials in collaboration with the child's parent or parents. 20 U.S.C. § 1414(d). The IDEA permits any party to file an administrative complaint challenging "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child," and an opportunity for an "impartial due process hearing by the State educational agency or by the local educational agency" to address such complaint. 20 U.S.C. § 1415(b)(6)(A), (f)-(h).

The IDEA further provides that "the court, in its discretion, may award

reasonable attorney's fees as part of the costs to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B). "Federal courts have jurisdiction over attorneys' fees suits resulting from an IDEA administrative proceeding." *John M. v. Bd. of Educ. of City of Chicago, Dist. 299*, 612 F. Supp. 2d 981, 990 (N.D. Ill. 2009) (citing *Bd. of Educ. of Oak Park v. Nathan R.*, 199 F.3d 377, 380-81 (7th Cir. 2000)); *see* 20 U.S.C. § 1415(i)(3)(A).

There is no dispute of material facts in this case, and the case turns solely on a legal question. As such, the case is properly decided on the legal arguments presented in the pending cross motions for summary judgment.[4] The legal issue here is whether Plaintiff's request for attorneys' fees is reasonable.[5]

Plaintiffs request $233,600.99 in attorneys' fees and costs, plus prejudgment interest. The District's motion for summary judgment argues that Plaintiffs' award should be reduced to $50,000.00, if anything at all, while Plaintiffs argue in their motion for summary judgment that the entire fee petition of $233,600.99 is reasonable.

In determining the reasonableness of a fee award, the Court begins with the lodestar analysis, which looks to "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *See Estate of Enoch v. Tienor*, 570 F.3d 821, 823 (7th Cir. 2009) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). "The Court may then adjust that figure based on the factors set forth in *Hensley*, such as the time and

---

[4] No party has specifically requested a hearing, and the Court finds that disposition on the papers alone is appropriate.

[5] The Court will begin its analysis by looking at the reasonableness of the fee award because the District does not specifically contest that Plaintiffs are prevailing parties. Instead, the District argues that Plaintiffs' fees are unreasonable in light of the degree of success obtained. Indeed, Plaintiffs qualify as prevailing parties under the IDEA. They need not have succeeded on every claim asserted in order to be prevailing parties.

labor required, the novelty or difficulty of the case, the degree of the success achieved, the experience and ability of the attorneys, the adequacy of the documentation of the hours, and whether appropriate billing judgment was used." *Ryan M.*, 731 F. Supp. 2d at 788 (citing *Hensley*, 461 U.S. at 430). The party who requests attorneys' fees bears the burden of proving the reasonableness of the fee request, including the hourly rate and amount of hours expended. *Id.* "The district court has the obligation to exclude any hours that are inadequately documented or that were duplicative or excessive." *Scott M. v. Board of Educ. of City of Chicago*, No. 09 C 6728, 2011 WL 1118706, at *2 (N.D. Ill. Mar. 25, 2011) (citing *People Who Care v. Rockford Bd. of Educ.*, 90 F.3d 1307, 1314 (7th Cir. 1996)). But the court should not "eyeball" the fee request and arbitrarily cut it down because it seems excessive. *Id.* "[F]ederal district courts have considerable discretion in granting an award of attorney's fees." *Ryan M*, 731 F. Supp. 2d at 788.

"In determining the amount of fees to award, the Court considers: (1) the difference between the relief sought and the amount recovered; (2) the significance of the legal issue on which the plaintiff prevailed; and (3) the public purpose of the litigation." *Brianna O. v. Board of Educ. of City of Chicago, Dist. 299*, No. 10 C 2132, 2010 WL 4628449, at *9 (N.D. Ill. Nov. 8, 2010) (citing *Monticello Sch. Dist. No. 25 v. George L.*, 102 F.3d 895, 908 (7th Cir. 1996)).

Plaintiffs hired the Chicago law firm of Equip for Equality ("EFE") to represent them for the due process complaint, and that firm has continued to represent Plaintiffs during the appeal in federal court and this attorneys' fees proceeding. In total, EFE spent 796.2 charged hours litigating the due process hearing, the federal court appeal, and the

attorneys' fees proceeding. During the due process hearing, Plaintiffs were represented by Margaret Wakelin and Dalia Gutman. During the federal court litigation, Plaintiffs were represented by Olga Pribyl, Ms. Wakelin, and Rachel Brady.

Ms. Pribyl has twenty-five years of litigation experience and has practiced special education and civil rights law for over twenty years (Doc. 30-3). She is EFE's Vice President of the Special Education Clinic and Pro Bono (*Id.*). She has litigated some of the first special education inclusion cases and some of the first ADA cases in Illinois (*Id.*). She bills at a rate of $425 per hour and she spent 86 charged hours on this case (*Id.*).

Ms. Wakelin was licensed in 2008, and she has been representing families in special education matters at EFE for nearly the entire period (Doc. 30-16). She bills at a rate of $325 per hour and $162.50 for travel time, and she spent 355.9 charged hours on this case (*Id.*).

Ms. Brady graduated law school in 2013 and joined EFE after completing a clerkship with the Seventh Circuit Court of Appeals (Doc. 30-17). She bills at a rate of $275 per hour and she has spent 60.8 charged hours on this case (*Id.*).

Ms. Gutman also graduated law school in 2013 and was a staff attorney at EFE from 2014-2015 (Doc. 30-18). She bills at a rate of $250 per hour, and $125 per hour for travel time (*Id.*). She has spent 293.5 charged hours on this case (*Id.*).

Plaintiffs have set forth affidavits that make representations as to the prevailing rates charged by attorneys with similar skill and experience in EFE's community. Specifically, Plaintiffs submitted affidavits of Richard Cozzola, Matthew Cohen, and Michael O'Connor, all attorneys who practice special education law in Chicago, who

state that the rates that EFE is seeking are reasonable given the attorneys' experience and knowledge in special education matters (Docs. 30-19, 30-20, 30-21). Richard Cozzola, who is a member of the Legal Assistance Foundation's ("LAF") attorneys' fees committee,[6] explains that EFE's rates are in line with the 2015 LAF schedule (Doc. 30-19, p. 5-6). Matthew Cohen, who has approximately thirty-five years of experience in the area of special education law currently charges an hourly rate of $450 per hour (Doc. 30-20, p. 3). Michael O'Conner, who has forty-six years of experience as a special education attorney, charges an hourly rate of $445 per hour (and his partner Sara Mauk has twelve years of experience as a special education attorney and charges $330 per hour) (Doc. 30-21, p. 2).

Plaintiffs also have submitted an affidavit from attorney Thomas Kennedy, who handles special education cases for children and families in Southern Illinois, and he also states that the rates charged by EFE are fair, reasonable, and customary in this area for attorneys of equivalent experience providing legal services of this nature (Doc. 30-4). Thomas Kennedy charges his clients $400 per hour and $450 per hour if he agrees to represent them on a contingency basis (*Id*.). Thomas Kennedy states in his affidavit that, to the best of his knowledge, his firm is the only firm who regularly represents parents in special education matters in Central and Southern Illinois (*Id*.). "Otherwise, families seeking legal representation in special education matters must seek assistance from attorneys in the Chicago area, where lawyer's fees are significantly higher." (Doc. 30-4,

---

[6] "The committee examines decisions evaluating attorneys' fees awards, develops LAF policies on attorneys' fees, and provides and maintains a schedule setting hourly rates for LAF staff. The schedule is based on fees granted in LAF cases and on [their] knowledge of fees awarded to non-LAF attorneys doing comparable work." (Doc. 30-19, p. 5).

p. 3).

**A.  Reasonableness of EFE's rates**

As to the rates charged by EFE, the District argues that Plaintiffs have not established that a paying client in the community would pay the hourly rates asserted, that there are other attorneys in the Southern Illinois area who have represented parents and/or students in matters under the IDEA, that Dalia Gutman's $250 rate is particularly unconscionable, and the nature of the case does not support the high hourly rates of $240 - $425 per hour.

The District cites to various cases as examples of hourly rates granted in various attorneys' fee petitions in the Southern District of Illinois. The Court does not find these cases to be comparable, however, because they do not involve parent-side special education attorneys. In fact, parents are encouraged to select an attorney with special education expertise, on the basis that it is a complex area of the law (Doc. 38-17). Illinois State Board of Education, https://www.isbe.net/Documents/attorney_guideline.pdf (last visited Aug. 16, 2018).

The District has attached an affidavit of defense counsel Merry Rhoades, who identifies four other individuals/entities that have represented parents and/or students in matters under the IDEA in Southern and/or Central Illinois: Land of Lincoln Legal Assistance Foundation, Prairie State Legal Services, Daniel Rhoads, and Michelle Schneiderheinze (Doc. 34-9). As to Land of Lincoln Legal Assistance Foundation and Prairie State Legal Services, it appears that they either could not have represented Plaintiffs due to Plaintiffs' geographical location and/or their eligibility requirements

(*See* Doc. 38-9, Doc. 38-10, Doc. 38-12). As to Daniel Rhoads, he states in his affidavit that, had Lisa A. contacted him to represent K.S. in the fall of 2014, his practice would have been less than two years old, and it would have been his first due process complaint filed in Illinois (Doc. 38-8). While it appears that Michelle Schneiderheinze could have represented Plaintiffs back in 2014, she is unaware of any other attorneys in the Central/Southern Illinois area who routinely perform legal services for plaintiffs in special education matters other than Thomas Kennedy. Additionally, she has not represented parents in a due process case in four years and does not have any such cases currently (Doc. 38-11).

Plaintiff Lisa A. stated in her affidavit that she "researched online and found the Special Education Clinic at Equip for Equality" and that she "was not aware of any other attorneys who could represent her" (Doc. 30-2, p. 2-3). The Court does not find it unreasonable that Lisa A. sought out a Chicago law firm to represent her for the due process hearing. The statute provides that "[f]ees awarded under this paragraph shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished." 20 U.S.C. § 1415(i)(3). The Seventh Circuit has held that, when analyzing prevailing community rates, if "a party does not find counsel readily available in that locality with whatever degree of skill may reasonably be required, it is reasonable that the party go elsewhere to find an attorney, and the court should make the allowance on the basis of the chosen attorney's billing rate unless the rate customarily charged in that attorney's locality for truly similar services is deemed to require an adjustment." *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 769 (7th Cir. 1982).

When considering all of the evidence submitted by both sides on this issue, it is apparent that private special education attorneys are not generally available in this region. The Court finds that Lisa A. acted reasonably in selecting a firm located in Chicago to represent her and her son. *See, e.g., Mr. & Mrs. W. v. Malito*, Civ. No. 92-1102, 1993 WL 764591, at *2 (C.D. Ill. Apr. 20, 1993). Based on the affidavits submitted from Chicago attorneys, Plaintiffs have sufficiently demonstrated that EFE's rates are reasonable for the Chicago area, with the exception of Dalia Gutman's rate.

Specifically, as to Ms. Gutman, the District argues that the $250 rate charged for her time is unconscionable in light of the fact that she was not admitted to practice law in Illinois until January 27, 2015. Ms. Gutman received her juris doctor in 2013 and became licensed to practice law in Florida in October 2013, and she then became licensed in Illinois between January and October 2015 as a Legal Service Program Lawyer (Doc. 30-18). Ms. Gutman has charged 293.5 hours on this case and charged half price for travel time. (Doc. 30, p. 8).

Plaintiffs support Ms. Gutman's hourly rate by pointing to the complex nature of special education cases and affidavits from other special education attorneys who agree that the specialized nature of these cases justifies an hourly rate higher than the general market rate for an attorney. The Court agrees that the complex nature of special education cases does justify a relatively higher hourly rate due to the specialization of practitioners, but the Court does not see how that logic can be applied to Ms. Gutman here.

Plaintiffs justify the use of interoffice conferences by pointing to a need to

supervise inexperienced attorneys (Doc. 30, p. 18-19). In support, they point out that Ms. Gutman had never represented a client in a due process hearing prior to this litigation (Doc. 30-18, ¶3). The Court finds reasonable the need for interoffice conferences to supervise less experienced attorneys (discussed below). What the Court does not find reasonable, however, is the combination of a specialist hourly rate with a claim that the same attorney is not experienced enough to proceed unsupervised.

In determining the proper hourly rate for Ms. Gutman, the District offers little help. The District attempts to convince this Court that Judge Reagan recently stated that experienced civil rights attorneys may be awarded $250 per hour, with less experienced attorneys collecting $200 per hour (Doc. 32, p. 7). In *Capps v. Drake*, however, Judge Reagan was making reference to a decade old case that he later acknowledged no longer "reflect[s] current market rates" for legal services. *Capps v. Drake*, Case No. 3:14-cv-441-NJR-DGW, 2017 WL 1178263, at *9 (S.D. Ill. Mar. 30 2017), *rev'd and remanded*, 894 F.3d 802 (7th Cir. 2018). In fact, in *Capps v. Drake*, Judge Reagan ultimately found that $350 per hour was reasonable for a lead attorney in civil rights litigation in the area. *Id.* Since the briefing concluded in this case, *Capps v. Drake* was reversed by the Seventh Circuit Court of Appeals and remanded to this Court for a determination of the amount of attorney's fees. *See Capps v. Drake*, 894 F.3d 802, 807 (7th Cir. 2018).

In 2010, a district court concluded that the hourly rate of $330 in the Chicago market for parent-side special education attorneys with more than twenty years of experience was reasonable, and so was a range of $85-$115 per hour for paralegals. *See Ryan M. v. Board of Educ. of City of Chicago, District 299*, 731 F. Supp. 2d 776, 788-89

(N.D. Ill. 2010). There, the defendants did not contest the rates, and the plaintiffs submitted affidavits illustrating the prevailing rates in the area. *Id*.

The 2015 case of *Valerio*, which addressed a first-year associate's hourly rate in the Chicago market, is illustrative of an analysis of an inexperienced attorney's hourly rate. *Valerio v. Total Taxi Repair & Body Shop, LLC*, 82 F. Supp. 3d 723, 735-37 (N.D. Ill. 2015). That case dealt with claims under Fair Labor Standards Act (FLSA), Illinois Minimum Wage Law (IMWL), and the Illinois Wage Payment and Collection Act (IWPCA). *Id*. The court rejected the first-year associate's requested hourly rate of $250, and subsequently rejected the affidavits of other attorneys claiming the rate was reasonable. *Id*. The first-year associate's own affidavit stated that he had charged only $195 an hour on prior employment cases, and thus the court held that this prior rate was reasonable. *Id*.

When considering the facts and relevant case law, the Court finds that $200 represents a reasonable hourly rate for an attorney with the experience and expertise of Ms. Gutman. Accordingly, the Court finds that Ms. Gutman's rate should be reduced to $200 per hour.

### B. Reasonableness of Time Charged

Plaintiffs submitted affidavits from special education lawyers confirming that their rates and time charged are reasonable. As discussed above, Thomas Kennedy submitted an affidavit explaining the complex, time consuming nature of special education cases (Doc. 30-4, ¶ 5). Matthew Cohen's affidavit also indicates that he reviewed the fee statements in this case and agrees that they are reasonable given the nature of the case (Doc. 30-20, ¶ 13). Plaintiffs have thus sustained the burden of

demonstrating that their time charged on this case was reasonable, and the burden shifts to the District to prove that it was not.

## I. Time Spent Preparing an Expert Witness for Testimony

The District argues that the total costs of preparing Dr. Golden's testimony was excessive and should be reduced, if not eliminated completely. The District points out that Ms. Gutman spent 26.8 hours, and Ms. Wakelin spent 15.2 hours on this witness, for a total cost of $11,640 (Doc. 34, p. 12).

First, the District argues that Plaintiffs cannot recover these costs at all because they amount to expert fees (Doc. 34, p. 12). It supports this argument by citing to a Supreme Court case that held the fee–shifting provision does not authorize prevailing parents to recover fees for services rendered by experts in IDEA actions. *Arlington Cent. School Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 293-94 (2006).

While it is true that expert fees may not be recovered under the IDEA's fee-shifting provisions, the Court disagrees with the District that the charges it objects to are expert fees. Here, Plaintiffs are not asking to be reimbursed for costs payable to Dr. Golden. Instead, Plaintiffs seek to recoup the time spent by their attorneys performing tasks such as preparing a witness for testimony. Because these fees are considered attorneys' fees, and not expert fees, the Court finds that the IDEA does not bar Plaintiffs from collecting on these charges.

The District also argues that the time spent preparing Dr. Golden for trial was excessive and duplicative. The District objects generally to the combined forty-two hours billed by Ms. Gutman and Ms. Wakelin relating to Dr. Golden's testimony (Doc. 34,

p. 12), but unfortunately does not cite to any case law in support of this argument. Instead, the District argues that the total time spent is excessive because Dr. Golden is a professional and was testifying to his own professional observation and therefore should not need much time to prepare. *Id.* Because of the complex nature of special education hearings and the lack of support for the District's general objection, the Court determines that Plaintiffs may recover fees relating to Dr. Golden's testimony.

## II.     Time Spent on Closing Arguments

The District takes issue with the $17,882 billed in connection with the closing arguments presented to the IHO via telephone conference (Doc. 34, p. 12). The District emphasizes that the closing argument was only twenty minutes in length, and that it was given via telephone. *Id.* The District urges this Court to hold that the thirty-two hours spent by Ms. Wakelin, who delivered the closing argument, and the roughly twenty-seven hours spent preparing the argument by Ms. Gutman is excessive. *Id.*

The District has not provided any basis for comparison to show that Plaintiffs' time spent on a closing argument was unreasonable. Instead, it argues that "[n]o reasonable paying client would pay" this price for a short closing argument (Doc. 34, p. 12).

Indeed, a discussion of an appropriate amount of time to spend on a closing argument will be strongly influenced by the specific facts and circumstances of the case. Throughout the arguments made by Plaintiffs, consistent is the emphasis on the complex and time-consuming nature of special education hearings.

The case of *Valerio* illustrates the difficulty in evaluating time spent on closing

arguments. *Valerio*, 82 F. Supp. 3d at 742-743. That case involved the Fair Labor Standards Act (FLSA), the Illinois Minimum Wage Law (IMWL), and the Illinois Wage Payment and Collection Act (IWPCA). *Id*. at 728. The court described the issues as "not particularly complex" noting there were no novel legal issues or dispositive motions involved in the litigation. *Id*. at 747. The defendants argued that the fourteen hours spent on the closing argument by two attorneys was duplicative and excessive. *Id*. at 742. The court held that the time spent on closing arguments was not excessive or duplicative reasoning that two attorneys working on a closing argument was not unreasonable, especially because one of the attorneys was a first-year associate who required supervision. *Id*. at 742 (*Citing Gibson v. City of Chicago*, 873 F. Supp. 2d 975, 989 (N.D. Ill. 2012). The court in *Valerio* also emphasized that it had no basis for comparison to determine whether the time spent was indeed excessive, such as evidence from Defendants that they performed similar tasks with similar results in substantially less time. *Id*. at 743.

Here, this case appears to be more complex than *Valerio*; it encompassed testimony from eighteen witnesses, hundreds of documents, and complicated educational issues (Doc. 38, p. 5). This case also involved an inexperienced attorney (Ms. Gutman), who was supervised by a more senior attorney (Ms. Wakelin), as well as 1.2 hours from a third, highly experienced attorney (Ms. Pribyl). While it is impossible to evaluate exactly how influential the closing argument was in the final decision, it is important to note that Plaintiffs were granted nearly everything they requested from the IHO (Doc. 1-1). Additionally, the District fails to present evidence of similar tasks being

performed with similar results for substantially less time. The District's argument that no reasonable paying client would pay such a fee, without supporting evidence, is insufficient to rebut Plaintiffs' reasonable fees supported by affidavits. Thus, the Court finds that Plaintiffs' closing argument fees are reasonable.

### III.    Time Spent on Interoffice Conferences

The District objects to a wide range of itemized charges on the grounds that they amount to duplicative, interoffice conferences (Doc. 34-13). The District highlights nearly every meeting between EFE's attorneys as an improper interoffice conference and argues that the $32,099.75 charged for these communications is excessive. *Id*.

Plaintiffs represent that these interoffice meetings were necessary in order to supervise their junior attorneys (Doc. 30, p. 18). Plaintiffs highlight the need for these supervisory meetings by explaining that Ms. Gutman had never represented a client in a hearing (Doc. 30-18, ¶3), and Ms. Brady had never written a motion to dismiss (Doc. 30-17, ¶6). Plaintiffs also explain that interoffice communications are standard practice and point to the specificity to which they recorded their billing to show that the billing was not duplicitous (Doc. 30, p. 19).

"The practice of law often, indeed usually, involves significant periods of consultation among counsel." *Tchemkou v. Mukasey*, 517 F.3d 506, 511 (7th Cir. 2008). "[A]ttorneys seeking reimbursement for internal meetings should identify explicitly the subject matter of their discussions so that we may assess whether the amount of time recorded was 'reasonably expended.'" *Id*. at 512. In *Tchemkou*, the Seventh Circuit reduced a claim for attorneys' fees by reducing the hours of interoffice communications

from twenty to ten. *Id*. The Seventh Circuit explained that the reduction was for a lack of specificity in their bills, and due to this lack of specificity "we cannot say that all of the internal communication time was 'reasonably expended.'" *Id*.

Here, however, it cannot be said that Plaintiffs did not bill with specificity. Plaintiffs submitted over sixty pages of billing records, detailed to the tenth of an hour, and described the nature of each activity (Doc. 30-15). Plaintiffs also did not charge for select interoffice communications by their attorneys. For example, Ms. Wakelin did not charge for two conferences with Ms. Pribyl and with Ms. Gutman on April 13, 2015 (Doc. 32-32, p. 19). The District, on the other hand, appears to object to each and every interoffice conference as being duplicitous simply because it involved multiple attorneys (Doc. 32-32). Taking into consideration the necessity of Plaintiffs' attorneys to have supervision, the highly descriptive nature of the billing statement, and the fact that Plaintiffs' counsel exhibited restraint when determining which meetings they would bill for, the Court finds that Plaintiffs are entitled to recover for their interoffice communications.

IV.     **Time Spent on Travel**

The District objects generally to the amount of travel time billed over the course of this case (Doc. 34, p. 13). While it acknowledges that Plaintiffs have already cut their hourly rate in half for all travel time, the District argues that the distance between Chicago and Vandalia is so excessive that Plaintiffs should have arranged to participate in some meetings remotely and that the number of attorneys who were traveling to these meetings is excessive. *Id*. The District puts forth no cases supporting the position that the

half-priced travel time is excessive.

On the other hand, Plaintiffs argue that they were entitled to charge their full hourly rates for travel time, but made the decision to charge the District at half-rate in order to make the fees more reasonable (Doc. 30, p. 17). Plaintiffs correctly cite to *Henry v. Webermeier* to explain the logic of charging for travel time. *Henry v. Webermeier*, 738 F.2d 188, 194 (7th Cir. 1984) (explaining that a lawyer incurs an opportunity cost, or forgoes the opportunity to work on another matter, when that lawyer travels for a client). The Court looks to the individual entries on the fee statement in order to determine their reasonableness.

On April 26, 2015, Ms. Gutman and Ms. Wakelin have identical entries for 5.7 hours described as "[p]icked up rental car with difficulty with changing location of rental car store and then traveled to Vandalia for hearing." (Doc. 32-32, p. 25). While the road to acquiring a rental car may occasionally contain a pothole, those administrative difficulties do not justify charging $3,277.50 for this non legal work. Plaintiffs point out, however, that they have billed at half their normal hourly rate for all travel, and the example above comes to $1,638.75 when that is factored in (Doc. 30-15, p. 26). In other words, 11.4 hours of billable attorney time (both Ms. Wakelin and Ms. Gutman charged 5.7 hours for this example) averaged less than $150 per hour for travel time.

The example discussed above is illustrative of the rest of the fee statement. The Court acknowledges that the distance between Vandalia and Chicago is significantly longer than if Plaintiffs had instead retained a more local attorney. But by reducing their travel fees to half price, Plaintiffs have sufficiently reduced this discrepancy on their

own, and there is no need to reduce fees for attorney travel any further.

## V. Time Spent on the Three Day Administrative Hearing

The District argues that the time Plaintiffs charged for the three day administrative hearing, and specifically the time charged during each of those three days, is excessive (Doc. 34, p. 14). The District asserts that this case was not unusually complicated, and therefore charging over $170,000 for the IHO hearing is excessive. *Id.* The District also takes issue with the number of hours that EFE's attorneys billed during the days of the actual hearing, including Ms. Wakelin billing greater than fifteen hours in one day for two of those days. *Id.* The number of hours billed by Ms. Wakelin and Ms. Gutman amount to 78.5 for the hearing. *Id.*

While it may appear at first glance that this time spent on the IHO proceedings may be excessive, upon closer inspection it does not appear to be unreasonable to have billed for that time. Primarily, the presence of travel time (which was charged at only half the normal billing rate) softens the high number of hours in a day. And the specificity of billing allows this Court to see that the time was not charged generally, but for specific tasks. Accordingly, the Court finds that Plaintiffs may recover for their time spent litigating the Due Process Hearing.

## VI. Time Spent on Federal Court Matters

Interestingly, the District objects to the $37,000 that Plaintiffs charged for defending against the District's own untimely appeal (Doc. 34, p. 14). The District also argues that the $49,000 charged for the current attorneys' fees litigation is excessive. *Id.* In arguing that the time spent defending the appeal is excessive, the District does not point to any case law to which to compare these charges, nor does it point to individual

charges. Thus, the Court finds that Plaintiffs may recover the $37,000 for the time spent defending against the District's appeal.

In arguing that the $49,000 spent on the current attorney's fees litigation is excessive, the District points to the case of *Scott M.* and argues that there the court held that $27,140.00 was reasonable for litigating a fee suit. *Scott M. v. Bd. of Educ.*, No. 09 C 6728, 2011 WL 1118706, at *9 (N.D. Ill Mar. 25, 2011).

Here, Plaintiffs provide detailed billing statements from all attorneys involved (Doc. 30-15). In fact, Plaintiffs frequently did not charge for hours put in on the fees litigation (*Id*. at p. 54-64). Taking into account the level of specificity in Plaintiffs' fee statement, and the District's general objection to the total cost of the fee statement, the Court is not inclined to reduce Plaintiffs' fees for time spent on federal court matters.

### C. Settlement Offer

The District argues that its April 2015 offer of settlement was substantially more generous than the relief ultimately obtained, and this cuts off any attorneys' fees after the date of the offer (Doc. 32, p. 9). Plaintiffs argue that the offer of settlement was not more generous than the substantial relief they were ultimately awarded and that Lisa A. was substantially justified in rejecting it (Doc. 30, p. 16).

The IDEA encourages settlement in lieu of administrative due process litigation by barring shifting of fees incurred after the school district makes a settlement offer that ends up being equal to, or more favorable than, the relief obtained by the student. Specifically, 20 U.S.C. § 1415(i)(3)(D) provides that attorneys' fees and costs may not be awarded after a written settlement offer if: (1) the offer is made more than ten days

before proceedings begin; (2) the offer is not accepted within ten days; and (3) the court finds that the relief eventually obtained is not more favorable than the settlement offer. This provision does not apply when a parent is "substantially justified" in rejecting the settlement offer. 20 U.S.C. § 1415(i)(3)(E).

The District made a settlement offer on April 17, 2015, with the following terms: (1) K.S. will remain at Cornerstone for the remainder of the school year and receive 30 minutes per week of direct social work services; (2) the District will arrange a visit to a college automotive program and assist Lisa A. in filling out a FAFSA form for K.S.; (3) K.S. will receive 50 hours of educational services at Vandalia High School; (4) K.S. will receive five, one-hour sessions with a transition coordinator; (5) K.S. will receive his high school diploma upon completion of requirements and will be able to participate in graduation the following year; and (6) the District will reimburse K.S. $100 per credit hour towards an automotive mechanic certificate, up to eight credit hours. This was the final settlement offer made by the District, and it is what the District points to as an offer better than the final relief obtained (Doc. 32-18).

In contrast, the IHO order on May 14, 2015 granted Plaintiffs: (1) rescission of K.S.'s expulsion; (2) reimbursement for the cost of an independent psychological evaluation; (3) an extension of K.S.'s eligibility under IDEA; (4) independent assessments of K.S.'s vocational, independent living, and community skills at the District's expense; (5) math and reading comprehension assessments provided by the District; (6) a social developmental history completed by the District; (7) accommodations for K.S.'s Attention Deficit Disorder in regards to the new assessments and evaluations;

(8) two-hour long individual counseling sessions through the end of the 2015-2016 school year; (9) enrollment in a summer automotive course at the District's expense; and (10) an IEP team to be assembled and create individualized goals and benchmarks (Doc. 1-1, p. 19-23).

The District claims that its settlement offer was "substantially more generous than the relief ultimately obtained" (Doc. 32, p. 9). In support, it points to the valuable fifty hours of one-on-one tutoring services, paid college credit, and the ability to participate in graduation. The District also argues that the relief granted by the IHO did not amount to any meaningful or substantive relief (Doc. 32, p. 10). It points out that K.S. did not take advantage of much of the relief granted, and that rescinding the expulsion is "irrelevant" because it merely remanded the manifestation decision to the IEP team and did not rule on the manifestation decision conclusively[7] (Doc. 32, p. 11). The District further argues that it would not have divulged the expulsion, except required by law, and that this is equivalent to rescinding the expulsion. The District provides a chart illustrating its argument (Doc. 32-31).

Plaintiffs, on the other hand, argue that the District's settlement offer was insufficient in many respects, and that it was rightfully rejected (Doc. 30, p. 16-17). Most notably, the settlement offer lacked an offer to rescind K.S.'s expulsion (*Id.*). The settlement offer also did not provide reimbursement for the independent evaluation Lisa A. had previously obtained, among other relief that the IHO granted (*Id.*). Plaintiffs also provide a chart to illustrate their side of the argument (Doc. 33-25).

---

[7] The IHO did rescind the expulsion, but on the grounds that Manifestation Determination Review ("MDR") was procedurally invalid. This, the District argues, allows the possibility for the expulsion to be reinstated upon a new, proper MDR. However, a new MDR was not pursued.

Determining the value of settlement offers in special education cases is difficult, as many of the provisions in the offer and final order cannot be easily quantified. In other cases, the court looks to the most important goals of the plaintiffs, and how they are met through the settlement offer versus the final order. *See, e.g.*, *Guillermo G. v. Board of Educ. of the City of Chicago, District 299*, No. 14 CV 3319, 2014 WL 5334182, at *4 (N.D. Ill. 2014) (IDEA case holding that after the plaintiffs expressed that attorney's fees must be part of any future settlement, and the defendant's subsequent settlement offer did not include attorney's fees, the plaintiffs were substantially justified in rejecting it); *Benito M. v. Board of Educ. of City of Chicago, District 299*, 544 F. Supp. 2d 713, 719 (N.D. Ill. 2008) (IDEA case holding that the settlement offer's lack of compensatory services and lack of specificity of where the plaintiff would continue his education compared to the final order justified the plaintiff in rejecting that offer); *John M. v. Board of Educ. of City of Chicago, District 299*, 612 F. Supp. 2d 981, 992 (N.D. Ill. 2009) (IDEA case holding that the lack of compensatory services in the settlement offer compared with the IHO order justified the plaintiff in rejecting the settlement offer).

Here, there are multiple differences between the settlement offer and the IHO's order. In the settlement offer, the District offered fifty hours of one-on-one tutoring as compensatory services but did not offer evaluations for K.S. The District contends this is a much more generous offer, but it appears Plaintiffs only requested the evaluations and a new IEP for K.S., which was granted by the IHO.

The biggest difference between the final settlement offer and the relief ordered by the IHO, however, relates to the issue of K.S.'s expulsion. Plaintiffs have requested that

the expulsion be rescinded throughout this litigation. The District's settlement offer did not include a rescission of the expulsion, but the IHO granted the rescission based on an inappropriate manifestation determination review. The settlement offer also did not offer reimbursement for independent evaluations to assess K.S.'s needs, which the IHO granted.

The Court ultimately concludes that Plaintiffs were substantially justified in rejecting the District's settlement offer because of its failure to meet a primary goal of Plaintiffs by offering a rescission of K.S.'s expulsion, and by failing to offer payment for independent assessments of K.S.'s needs. Thus, the settlement offer did not cut off attorneys' fees after the date of the offer.

### D. Reasonableness of Fees in Light of Plaintiffs' Degree of Success

The District argues that the relief obtained does not correlate to the amount of fees Plaintiffs request (Doc. 32, p. 16). Specifically, the District argues that the monetary award of a couple thousand dollars for K.S.'s evaluations does not justify the over $200,000 of attorneys' fees requested (*Id.*). The District also takes issue with the fact that K.S. did not utilize the services that were awarded via the proceedings, and that "no person or entity has looked at his records." (Doc. 32, p. 17). Finally, the District argues that Plaintiffs repeatedly failed in their efforts to get a stay-put order allowing K.S. to go back to Vandalia High School during the hearing, and that they failed completely regarding the graduation issue (Doc. 34, p. 11-12).

The District cites *Benito M. v. Bd. of Education*, 544 F. Supp. 2d 713 (N.D. Ill. 2008), in support of its request that Plaintiffs' requested fees be reduced based on their degree

of success. *Benito* was a case under the IDEA where the student was considered to be the prevailing party by the court because the plaintiff was placed at the desired school and received specialized benefits there. *Id*. Although this was the plaintiff's main objective, the court also listed multiple requests that failed, such as: receiving speech/therapy sessions for a year, being reimbursed for independent evaluations, and additional tutoring sessions, among others. *Id*. Taking those factors into consideration, the court held that, although the plaintiffs succeeded in regard to their primary objective, the failed objectives should be taken into consideration and the overall attorneys' fees should be reduced by 15%. *Id*. Then court chose a percentage reduction, as opposed to an itemized reduction of specific charges, because the activities were inextricably tied to the rest of the case and the charges could not be separated. *Id*.

The Court may reduce the amount of attorneys' fees awarded based on the degree of success achieved through the litigation. *Ryan M. v. Board of Educ. of City of Chicago, Dist. 299*, 731 F. Supp. 2d 776, 788 (N.D. Ill. Aug. 9, 2010) (citing *Hensley*, 461 U.S. at 430)). To determine whether this is necessary, the Court compares the relief sought by Plaintiffs with the relief eventually granted by the IHO.

In this case, Plaintiffs initially made six requests of the IHO (Doc. 33-14, p. 11). Of those six, the IHO granted four completely, partially granted a fifth, and denied the sixth, explaining it was not within the authority of the IHO (Doc 33-1, p. 18-20). Notably, Plaintiffs were successful on the issue of the most importance to them, rescinding K.S.'s expulsion (*Id*.). The IHO also granted relief that was not requested by plaintiffs, including additional psychological and social assessments to be paid for by the District

(*Id*.). Plaintiffs achieved near complete success in the IHO hearing—they received nearly all that was requested, including the major goal of the litigation, which was to have K.S.'s expulsion rescinded.

The District points to Plaintiffs' failed attempt to allow K.S. to participate in graduation as a glaring failure that merits a reduction in fees (Doc. 32, p. 14). With respect to graduation, the IHO did not grant K.S. the ability to participate in the VCHS graduation ceremony (Doc. 1-1, p. 19). The IHO explained that he did not have the authority to grant the request because participating in the graduation ceremony was not part of K.S.'s FAPE nor was it mentioned in any of his IEPs (*Id*.).

In contrast, the *Benito M.* court found that denial of requested weekly speech/language services, reimbursement for independent evaluations, weekly therapy services, and weekly tutoring services by a certified teacher warranted a fifteen percent reduction in the lodestar amount. *Benito*, 544 F. Supp. 2d at 721. The main goal of that litigation, which was successful, was to place the plaintiff at a specific school, where he would receive benefits such as social work services and access to assistive technology resources. *Id*.

Here, it seems the graduation issue was a much smaller part of the litigation than the multiple failures discussed above. While there is no doubt that Plaintiffs sought for K.S. to participate in the graduation ceremony, and they were unsuccessful in this regard, the rescission of the expulsion and the additional educational benefits awarded overshadow this single failure. Because the issue of graduation participation was only a very small part of the larger legal battle in front of the IHO, and because Plaintiffs

achieved near total success there, reduction of attorney's fees for the graduation issue is not appropriate.

Next, the Court turns to the stay-put motion. Plaintiffs requested relief in the form of K.S. being allowed to return to VCHS once the forty-five day interim appointment expired (Doc. 30-7). Insofar as the Court can tell, this was Plaintiffs' sole objective regarding the stay-put motion, and no other relief was sought by Plaintiffs' counsel during the stay-put proceedings (*Id*.). Plaintiffs point out that the IHO granted relief in the form of an IEP meeting to provide immediate improvements for K.S. at the alternative school (Doc. 30-8, p. 5-6). These improvements, however, were not requested by Plaintiffs.

Plaintiffs argue that they are entitled to recover for the entire cost of the unsuccessful stay-put motion because it was "an example of vigorous lawyering…done to advance the Plaintiffs' goal of correcting K.S.'s inappropriate removal to an alternative school." (Doc. 30, p. 15). Plaintiffs further point out that the stay-put order provided benefits and relief to K.S. while he was at the alternative school (Doc. 30, p. 16). It is important to note, however, that Plaintiffs never requested or sought these benefits.

Comparing the perceived purpose of the stay-put motion (allowing K.S. to remain at VCHS) with the outcome of the motion (educational benefits at K.S.'s alternative placement), the Court concludes that the outcome is untethered from the goal. Therefore, the Court finds that Plaintiffs were unsuccessful in their litigation regarding the stay-put motion, and the attorneys' fee award should be reduced in this regard to reflect Plaintiffs' degree of success. Accordingly, the District's motion for summary judgment is

granted with regard to fees relating to the stay-put motion. All fees relating to the stay-put motion shall be deducted from Plaintiffs' fee petition.[8]

### E. Prejudgment Interest

Plaintiffs submitted a request for attorney's fees to the District on December 15, 2015 (Doc. 38-7). After failing to come to an agreement with the District, Plaintiffs subsequently filed this complaint for attorney's fees on January 7, 2016 (Doc. 1).

The District argues that this Court should deny Plaintiffs' request for prejudgment interest. The District puts forth three arguments in advocating for its position. First, it argues that prejudgment interest would act as a "bonus" or "multiplier" in IDEA cases, which is prohibited by the statute (Doc. 34, p. 18). 20 U.S.C. §1415(i)(3)(C). Second, it argues that awarding prejudgment interest in this case would not further the goal of fully compensating Plaintiffs (Doc. 34, p. 19). Finally, it argues that prejudgment interest, even if allowed in cases under the IDEA, is left to the discretion of the Court and should not be awarded because the District never had a reasonable opportunity to review and consider the attorney's fees request submitted by Plaintiffs (Doc. 34, p. 19). The District points to the three-week period between the fee request and the filing of the Complaint as insufficient, primarily because the time period occurred during the winter holidays and, as a result, the Board was unable to convene and discuss the fee request (Doc. 34, p. 19).

---

[8] Because the fees charged regarding the stay-put motion can be clearly defined and separated by Plaintiffs, the Court finds that the specific amount shall be deducted, rather than a percentage amount. Nonetheless, because some of the entries do not specifically reference "stay put," even though it appears that the entry relates to such motion, the Court puts the onus on Plaintiffs to perform this accounting work and re-submit a bill to the District that complies with this Court's Order.

It is well established that "prejudgment interest is presumptively available to victims of federal law violations." *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 572 (7th Cir. 2003). "The basic purpose of prejudgment interest is to put a party in the position it would have been in had it been paid immediately. It is designed to ensure that a party is fully compensated for its loss." *American Nat'l Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 935 (7th Cir. 2003); *see also City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195 (1995) ("The essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss.").

The District argues that prejudgment interest in this case would amount to a bonus or multiplier to the attorney's fees, which the IDEA prohibits. 20 U.S.C. § 1415(i)(3)(C). The District does not cite to any case where prejudgment interest has been denied under the IDEA, nor does it provide any support other than the language of the statute itself (Doc. 34, p. 18-19).

While the Seventh Circuit has not explicitly addressed awarding prejudgment interest for attorney's fees under the IDEA, other district courts have held that prejudgment interest may be applied to attorney's fees litigation under the IDEA. *See e.g.*, *Judah M. v. Board of Educ. of City of Chicago, Dist. 299*, 798 F. Supp. 2d. 942, 953-54 (N.D. Ill. 2011); *see, e.g. M. v. Board of Educ. of City of Chicago*, No. 10 C 2110, 2010 WL 2698285 (N.D. Ill. July 7, 2010). Other circuits have also held that prejudgment interest may be awarded in cases brought under the IDEA. *See, e.g., Termine ex rel. Termine v. William S. Hart Union High Sch. Dist.*, 288 F. App'x 360, 363 (9th Cir. 2008). Additionally,

"prejudgment interest should not be thought of as a windfall," instead, "it is simply an ingredient of full compensation that corrects judgments for the time value of money." *Board of Educ.*, 2010 WL 2698285, at *7 (*citing Matter of P.A. Bergner & Co.*, 140 F.3d 1111, 1123 (7th Cir. 1998)). The Court finds these cases persuasive and adopts the logic that prejudgment interest may be applied to attorney's fees litigation brought under the IDEA. Accordingly, the Court rejects the District's argument that prejudgment interest amounts to an improper "bonus" or "multiplier" to attorney's fees under the IDEA.

The District's second argument rests on the premise that Plaintiffs may be fully compensated without prejudgment interest, and therefore awarding prejudgment interest would be inappropriate (Doc. 34, p. 19). The District supports this argument by pointing out that the parents were never required to pay out-of-pocket for attorney's fees (Doc. 34, p. 19). Unfortunately, however, the District points to no authority indicating that the lack of out-of-pocket expenses should result in denying prejudgment interest. The purpose of prejudgment interest is to account for the "time value of money" if the judgment had been paid immediately. *Matter of P.A. Bergner & Co.*, 140 F.3d 1111, 1123 (7th Cir. 1998). The District mischaracterizes prejudgment interest as a tool to make up for only the inconvenience of paying for expenses out-of-pocket during the litigation. Prejudgment interest is also used to remove the incentive for a defendant to delay in the payment of a judgment. *See Judah M.*, 798 F. Supp. 2d at 954. Because prejudgment interest is aimed at closing the gap between the value of the sum when awarded and the value of that same amount now, the Court finds that it would be appropriate to award prejudgment interest to compensate Plaintiffs for the time value of money in this case.

Finally, the District argues that this Court should apply its broad discretion in denying prejudgment interest in this case because the timing between the date the fee request was presented to the District and the date the complaint was filed in this case did not afford the District a reasonable opportunity to respond (Doc. 34, p. 19). The two dates were December 15, 2015, and January 7, 2016, respectively (Doc. 38, p. 2). Specifically, the District contends that Plaintiffs chose this timing with knowledge that it would be difficult for the District to respond during the winter holiday period (Doc. 34, p. 19). The argument follows that the District was not afforded a reasonable opportunity to review the requested fees before Plaintiffs filed this lawsuit and that this behavior by Plaintiffs should be discouraged, and prejudgment interest should not be awarded. The District also presents evidence that it would consider the demand at its January 19, 2016 meeting (Doc. 34-2). Plaintiffs respond and explain that they filed the complaint when they did only to ensure that it was timely filed (Doc. 38, p. 2).

The District does not provide the Court with case law indicating that a three-week gap between the attorney's fees request and filing an attorney's fees complaint is dispositive with an award for prejudgment interest. The District does, however, point to cases that highlight the fairness of affording the school district a reasonable period of time to review the charges before prejudgment interest begins to accrue.

The Seventh Circuit has instructed that "prejudgment interest typically accrues from the date of loss or the date on which the claim accrued" in order to "put a party in the position that it would have been in had it been paid immediately." *Am. Nat. Fire Ins. Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 935 (7th Cir. 2003) (citations omitted). District

courts have interpreted this instruction three different ways in applying it to the IDEA. Some courts have held that the accrual of prejudgment interest starts on the date of the IHO ruling. *See, e.g.*, *Ryan M.*, 731 F. Supp. 2d at 796. Another view has been to begin the accrual of prejudgment interest on the date that a plaintiff submits his fee request. *See, e.g.*, *Stephanie J. v. Board of Educ. of City of Chicago, District 299*, Civil Action No. 10 C 1359, 2010 WL 3070461, at *5 (N.D. Ill. 2010). Finally, a third technique used is to grant a reasonable time to review the fee request before starting the accrual of prejudgment interest. *See Bd. of Educ. of City of Chicago v. Walker*, 800 F. Supp. 2d 917, 927 (N.D. Ill. 2011) (holding that prejudgment interest would not start accruing until 30 days after the fee request). A determination of prejudgment interest depends on the specific facts of each case.

Here, it seems the most appropriate date to begin accruing prejudgment interest is January 19, 2016, as this was the first date that the District claims to have been able to review the requested fees. This date best compensates Plaintiffs for the time value of money, while also allowing the District a reasonable amount of time to review the fees without being charged interest.

In the absence of a statutorily defined rate, and the absence of circumstances requiring "refined rate setting," the Court uses the prime rate for the appropriate period to determine the prejudgment interest rate. *First Nat'l Bank of Chi. v. Standard Bank & Trust,* 172 F.3d 472, 480 (7th Cir. 1999). The average prime rate from January 19, 2016, to

the present is 4.01 percent.[9] Thus, the Court finds it appropriate to award Plaintiffs 4.01% prejudgment interest from January 19, 2016, to the present.

CONCLUSION

For the reasons explained above, the Court **GRANTS in part** and **DENIES in part** both Plaintiffs' and the District's motions for summary judgment (Docs. 29 and 31). The Court, in its discretion and pursuant to 20 U.S.C. § 1415(i)(3)(B), reduces Plaintiffs' fee petition of $233,600.99 by: (1) any and all fees relating to the stay-put motion; and (2) Dalia Gutman's reduced hourly rate of $200. The Court also awards Plaintiffs 4.01% prejudgment interest from January 19, 2016 to the present.

This action is **DISMISSED with prejudice**, and judgment will be entered accordingly.

**IT IS SO ORDERED.**

**DATED:   August 21, 2018**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**

---

[9] The Seventh Circuit in *First Nat. Bank of Chicago* instructs in footnote 9 that "the average prime rate for the entire time period was the appropriate measure, rather than the current prime rate." *First Nat. Bank of Chicago*, 172 F.3d at 481 n. 9. The Court finds that average prime rate for the particular time period to be 4.01%. http://www.federalreserve.gov/releases/h15/data.